Ryan B. Bell (9956)
**KUNZLER BEAN & ADAMSON, PC**
50 W Broadway, Suite 1000
Salt Lake City, UT 84101
(801) 994-4646
rbell@kba.law

Michael S. Nadel (*pro hac vice* forthcoming)
Rachel M. Peltzer (*pro hac vice* forthcoming)
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000
mnadel@mwe.com
rpeltzer@mwe.com

Jenny Lee (*pro hac vice* forthcoming)
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017
(212) 547-5400
jennylee@mwe.com

*Attorneys for Plaintiff Parker J. Collier*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| PARKER J. COLLIER, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>SONJA EDDINGS BROWN, an individual,<br><br>    Defendant. | **VERIFIED COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Case No. 2:25-cv-00506<br><br>Judge _____<br><br>Magistrate Judge _____ |

Plaintiff Parker J. Collier ("Plaintiff" or "Ms. Collier"), for her complaint against Defendant Sonja Eddings Brown ("Defendant" or "Ms. Brown"), alleges as follows, upon personal knowledge or upon information and belief:

## NATURE OF THE ACTION

1.      This action arises out of a vindictive and defamatory campaign that Sonja Eddings Brown waged against Parker Collier.  Ms. Brown's objective was simple: to extort money from Parker Collier and her family.

2.      Ms. Brown—who previously consulted for companies owned by the Colliers— filed an unfounded and frivolous lawsuit, wholly detached from reality, against Ms. Collier in federal court.  The complaint alleged, among other things, that Ms. Collier had been involved in a sale of supposedly contaminated land to the State of Florida.  The complaint contained numerous defamatory statements regarding Ms. Collier.  Initially, the defamatory statements were redacted from the version of the complaint that was publicly filed.

3.      Then Ms. Brown filed a First Amended Complaint, which also contained redacted defamatory statements.  Ms. Brown apparently believed that there would be a significant interval before the redacted statements were revealed publicly—time she could use to extort payment from Ms. Collier based on the threat of the First Amended Complaint becoming public.  However, the filing of the First Amendment Complaint unexpectedly triggered a court order resulting in the public filing of the unredacted First Amended Complaint, with all its defamatory statements.

4.      Ms. Brown decided to go beyond her complaint in order to up the ante:  she went to the media.  Indeed, before filing the unredacted version of the First Amended Complaint, Ms. Brown used the services of one or more media relations representatives to ensure that the

allegations would be publicized. Ms. Brown directed her publicity efforts from Utah. On Ms. Brown's behalf, her media relations representative(s) promoted and disseminated Ms. Brown's allegations.

5.    Because of Ms. Brown's efforts and those of her agents, Ms. Brown's defamatory allegations regarding Ms. Collier became excessively publicized in the news. Ms. Brown's defamatory statements set the front pages of The Miami Herald and The Naples Daily News—Ms. Collier's hometown paper, still widely read in hardcopy—ablaze with her sensational and false allegations of Ms. Collier's supposed contaminated land and corrupt business dealings with the State of Florida. The news was picked up by national sources and spread across the country via the Internet.

6.    Ms. Brown's defamatory statements have significantly damaged Ms. Collier's reputation. Ms. Collier brings this action to clear her reputation and to hold Ms. Brown accountable for her bad acts.

## THE PARTIES

7.    Plaintiff Parker J. Collier is a citizen and resident of the state of Florida.

8.    Defendant Sonja Eddings Brown is a citizen and resident of the state of Utah. Upon information and belief, Ms. Brown resides at 1437 E. South Temple Street, Salt Lake City, Utah 84102.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Ms. Collier is a citizen of Florida and Ms. Brown is a citizen of Utah, and the amount in controversy exceeds $75,000.

10.     This Court has general personal jurisdiction over Ms. Brown because she is a citizen of the state of Utah and committed the acts giving rise to this action in Utah.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Brown resides in this district, and further, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

12.     Pursuant to the Utah Rules of Civil Procedure, Plaintiff files this Complaint as a Tier 3 Complaint.

## FACTUAL ALLEGATIONS

### *Background*

13.     Ms. Collier and Ms. Brown first met in 2010.  Ms. Brown purported to be a political consultant and later performed various public relations, media, and politically-oriented tasks for Ms. Collier.

14.     Through Ms. Collier, Ms. Brown was introduced to Collier Enterprises, Inc. ("Collier Enterprises"), a business ultimately owned by Ms. Collier's husband and his brothers. Ms. Collier has no ownership or equity interest in Collier Enterprises, and she never has.  Through Ms. Brown's company, SEBMedia, Inc., Ms. Brown became a consultant for Collier Enterprises in 2016.

15.     As a consultant for Collier Enterprises, Ms. Brown was asked to perform various tasks appropriate for someone with the background Ms. Brown claimed to have.  For example, Ms. Brown was contracted to a role in producing a short film.  Ms. Brown was contracted to provide marketing and support in support of an auction.  She was contracted to assist in the creation of political action committees and advise on political donations.

16.    In or around April 2020, Ms. Brown's contractual relationship with Collier Enterprises ended.

17.    In the summer of 2023, the South Florida Water Management District purchased 11,142 acres of Everglades land from Collier Enterprises-affiliated entities.  The funding for this purchase came from an appropriation led by Florida Senate President Kathleen Passidomo and supported by numerous stakeholders.

18.    Through the sale, Florida placed the land in conservation.  More than a quarter of the land is mangrove habitat, critical for water quality and storm protection.  The uplands are home to black bears, Florida panthers, and 37 other federally listed species in the region.

19.    Ms. Collier was not involved in the sale of the land, nor, during the time period at issue, was she involved in the business of Collier Enterprises.

### *Brown's Federal Action Complaint*

20.    Ms. Brown apparently took great offense that her contractual relationship with Collier Enterprises ended in 2020.  Rather than moving on with her life, Ms. Brown sought out for the next several years any means to exact her revenge.  Ms. Brown's first pursued claims in arbitration against Ms. Collier and her husband, Collier Enterprises, and other Collier-affiliated entities.  Ms. Brown dismissed her arbitration claims against Ms. Collier but persisted in litigating against Ms. Collier and Collier-affiliated entities.  By spring 2024, Ms. Brown had burned through several law firms, and it was apparent her specious claims were going nowhere.

21.    Instead of backing down, Ms. Brown escalated the dispute.  On April 22, 2024, Ms. Brown suddenly threatened, through her attorneys, to initiate a federal lawsuit against Ms. Collier *later that day*, unless Ms. Collier paid her $500,000.  Knowing that Ms. Collier greatly values her

privacy, Ms. Brown hoped that the threat of a publicly-filed lawsuit would enable her to extort a significant settlement from Ms. Collier.

22.     But Ms. Brown underestimated Ms. Collier.  Ms. Collier knew she had done nothing wrong, either with respect to Ms. Brown or otherwise.  So Ms. Collier stood her ground.

23.     Ms. Brown opted to carry through on her threat.  That day, she filed a lawsuit against Ms. Collier in the United States District Court for the Middle District of Florida, captioned *Sonja Eddings Brown v. Parker J. Collier*, No. 2:24-cv-00369-JLB-NPM.  Ms. Brown's complaint was unfounded and frivolous.

24.     Initially, Ms. Brown redacted from the complaint the defamatory allegations against Collier.  Upon information and belief, Ms. Brown hoped that the threat of release of an unredacted complaint and the attendant publicity would force Ms. Collier to pay to settle the matter.  Ms. Brown knew that Ms. Collier would wish to stay out of the headlines.  But at the same time, she recognized the possibility that Ms. Collier would not immediately fold.  So Ms. Brown developed a "Plan B."  Directly or indirectly, Ms. Brown engaged media relations consultants to shop the complaint to generate media attention in the event of its eventual unsealing.  Ms. Brown believed that if the threat of bad publicity would not make Ms. Collier back down, perhaps actual bad publicity would.  But she believed there would be time for Ms. Collier to back down.

25.     On June 25, 2024, Ms. Brown filed a First Amended Complaint in the federal action.  Although the First Amended Complaint was filed publicly, the numerous defamatory statements were redacted.  When Ms. Brown took that approach with her original complaint, the court directed her to file an unredacted version under seal and then go through the sealing process, which, in the Middle District of Florida, permits a party or non-party interested in maintaining the

seal to file an opposition to the motion to seal within 14 days of a motion to seal, with a reply due 21 days later.

26.    Brown may have expected the court to take the same approach with the First Amended Complaint, such that she would have had more than a month to extort a settlement with Ms. Brown under the threat of adverse publicity.  The court, however, interfered with her plan. On June 26, 2024, the day after the First Amended Complaint was filed, the court unexpectedly ordered Ms. Brown to publicly file an unredacted version of the First Amended Complaint.

27.    On June 27, 2024, through her attorneys, Ms. Brown again urged Ms. Collier to settle with her to avoid the amended complaint from being filed and the related negative publicity. Still Ms. Collier did not back down.  So Ms. Brown publicly filed an unredacted version of the First Amended Complaint.

28.    From Utah, Ms. Brown used one or more media relations consultants to promote the unredacted First Amended Complaint.  And, as Ms. Brown intended, the allegations in Ms. Brown's First Amended Complaint became grist for the newspapers.  Ms. Brown's defamatory statements were the subject of news reports published by The Miami Herald, The Naples Daily News, Tampa Bay Times, PBS and NPR for Southwest Florida, The Orlando Sentinel, Politico, The Latin Times, among other sources, and were widely circulated.

### Brown's Defamatory Statements

29.    Ms. Brown is a serial fabulist.  Her allegations in the federal action were simply bad fiction intended *not* to state serious legal claims but rather to capture headlines.

30.     The First Amended Complaint was riddled with false, fanciful statements regarding Ms. Collier, her family, Collier Enterprises, and Ms. Brown's involvement with the Colliers and Collier Enterprises.

31.     The First Amended Complaint, which was disseminated to news outlets to generate media attention at Ms. Brown's direction, falsely alleged, among other things, that Ms. Collier engineered the promotion and sale of contaminated land in May 2023, that Ms. Collier made millions from the sale of the allegedly polluted land, that Ms. Collier intentionally made material misrepresentations and omissions to Ms. Brown, and that Ms. Collier improperly engineered Ms. Brown's termination from Collier Enterprises.  *See* **Exhibit 1** ¶¶ 1, 2, 4-8, 43, 44, 46, 48, 66-68, 89-91, 93, 105, 133, 134, 142, 143, 151, 152, 161, 162, 172.  None of those allegations were true and what is more, Brown knew they were not true when she shopped them around to the news media.

32.     In the First Amended Complaint, Ms. Brown made false statements regarding the land sold to Florida, including:

a.     "This case centers on a businesswoman and matriarch of a powerful Florida family, Parker Collier, and the unlawful acts she perpetrated to enrich herself by engineering the promotion and sale of 8,000 acres of land contaminated with deadly creosote in the Everglades ("Everglades Parcel") in May 2023."  *Id.* ¶ 1.

b.     "[T]he Everglades Parcel that Mrs. Collier was determined to dump was toxic."  *Id.* ¶ 5.

    c. "Mrs. Collier intentionally made material misrepresentations and omissions to Brown including the past and present creosote contamination on the Everglades Parcel ...." *Id.* ¶ 133, 142; *see also id.* ¶ 151, 161.

33.    But Ms. Collier was not involved in the promotion or sale of the Everglades land to the State of Florida.

34.    Further, the Everglades land that was sold to the State of Florida is neither toxic nor contaminated with deadly creosote. The land was cleaned up. Ms. Collier made no misrepresentations to Ms. Brown regarding the Everglades land.

35.    The First Amended Complaint also contains false statements that Ms. Collier profited from the sale of allegedly polluted land, including:

    a. "Mrs. Collier and her family actually made money from the polluted land—nearly $30 million." *Id.* ¶ 1.

    b. "As a result, Mrs. Collier and her family profited from the polluted land while leaving residents at risk of exposure to toxic chemicals in the water they drink, cook, and shower with." *Id.* ¶ 6.

    c. "Mrs. Collier perceived Brown's efforts toward identifying and reporting malfeasance within Collier Enterprises as detrimental to the prospective Everglades and Rivergrass deals. Upon information and belief, Mrs. Collier feared that if the truth about the contamination on the Everglades Parcel and [former executive Don] Huffner's malfeasance came to light, it could jeopardize the success of both the Everglades and Rivergrass land deals, dramatically decreasing the value of Collier Enterprises to a potential buyer." *Id.* ¶ 46.

d. "Parker Collier has benefitted significantly from her interference with Brown's contractual and business relationship because, by having Brown fired, she was able to conceal the misconduct and malfeasance in which the Colliers were engaged with respect to the Everglades Parcel and Rivergrass, thereby facilitating the ultimate lucrative sale of Collier Enterprises to Tarpon Blue on October 17, 2022." *Id.* ¶ 66.

e. "Notably, the sale of Collier Enterprises has netted Mrs. Collier significant personal benefits—entirely separate from those that accrued to the Company. Upon information and belief, before the sale, Barron Collier II, had precluded Mrs. Collier from any involvement in the Company's business although, as evidenced here, she often ignored this directive. The sale of the Company was, therefore, more than merely a financial boon to Mrs. Collier. It not only enriched the Company in which her husband held a direct economic stake; upon information and belief, it also transformed her husband's interest in that Company into assets over which Mrs. Collier could exercise direct control. Mrs. Collier frequently confided in Brown her goal of obtaining control over such assets in the event Miles Collier died. Mrs. Collier should not be permitted to retain these ill-gotten gains, obtained as a direct and proximate result of her tortious conduct against Brown." *Id.* ¶ 67.

36. Ms. Collier did not make any money from the sale of the Everglades land.

37. Ms. Collier did not place anyone at risk of exposure to toxic chemicals.

38. Ms. Collier did not have Ms. Brown fired.

39. Ms. Collier did not conceal misconduct and malfeasance, nor was she engaged in misconduct or malfeasance.

40.    Ms. Brown also made false statements that Ms. Collier intentionally made material misrepresentations and omissions to Ms. Brown, including:

a.  "To further this illicit scheme, Mrs. Collier fraudulently misrepresented to and concealed material facts from Plaintiff Sonja Brown, a veteran strategic communications and government relations expert whom Mrs. Parker and the Collier family had hired to manage a variety of business and personal matters for over a decade. Specifically, Mrs. Collier hid from Brown that the Everglades Parcel she was promoting to federal and state officials had suffered an explosion that caused 3,000 gallons of creosote—a toxic wood preservative known to cause cancer, birth defects and other illnesses—to contaminate the property and the drinking water of residents in the surrounding area. To the contrary, Mrs. Collier falsely told Brown that the creosote contamination, which she said had happened a long time ago, had been cleaned up. And despite knowing that Brown would be interacting with President Donald Trump and senior White House and campaign staff, as well as Governor Ron DeSantis and his senior team, regarding the acquisition, she told Brown not to discuss the creosote during her meetings." *Id.* ¶ 2.

b.  "As Brown only recently came to learn well after her termination, Mrs. Collier sought to conceal the fact that the Everglades Parcel had not been fully cleaned up because she did not want anything to undermine her efforts and those of her family to unload the property to the federal or state governments." *Id.* ¶ 4.

c.  "These were not Mrs. Collier's only fraudulent acts. . . . [S]he also misrepresented and concealed material facts related to the Colliers' second business objective: securing local government approval to develop a portion of Collier land into residential and mixed-use developments, the largest of which was the Rivergrass Development ("Rivergrass")."  *Id.* ¶ 7.

d.  "Mrs. Collier then knowingly misrepresented to Brown that Huffner had been suspended and then fired."  *Id.* ¶ 43.

e.  "Brown was shocked to later learn that Mrs. Collier had lied to her and that Huffner had not been terminated and was still very much engaged in the business affairs of Collier Enterprises."  *Id.* ¶ 44.

f.  "Parker Collier has benefitted significantly from her interference with Brown's contractual and business relationship because, by having Brown fired, she was able to conceal the misconduct and malfeasance in which the Colliers were engaged with respect to the Everglades Parcel and Rivergrass, thereby facilitating the ultimate lucrative sale of Collier Enterprises to Tarpon Blue on October 17, 2022."  *Id.* ¶ 66.

g.  "Mrs. Collier directed Brown not to discuss the creosote history as the explosion had happened long ago and was dealt with."  *Id.* ¶ 89.

h.  "Mrs. Collier knew or should have known that her statement regarding the condition of the property was not true given her extensive and longtime involvement in Collier business affairs and her role as an adviser to Miles Collier."  *Id.* ¶ 90.

i.  "Mrs. Collier not only deliberately requested that Brown lead talks with the White House regarding the Everglades Parcel opportunity while failing to disclose its toxic history, she knowingly misrepresented that the contamination had been cleaned up and omitted crucial facts as to the polluted condition of the property so as to induce Brown to continue to be associated with and promote the sale of the property. Driven by her goal to offload the contaminated property—a deal that would directly benefit her—Mrs. Collier lied to Brown. Her intent was to discourage Brown from asking more questions and potentially derailing the land acquisition by unearthing the extent of the contamination of the Everglades Parcel and the Collier Family's efforts to cover it up." *Id.* ¶ 91.

j.  "Mrs. Collier's misrepresentation about the condition of the Everglades Parcel." *Id.* ¶ 93; *see also id.* ¶ 105.

k.  "Mrs. Collier intentionally made material misrepresentations and omissions to Brown including the past and present creosote contamination on the Everglades Parcel and that the Colliers had suspended, and ultimately, terminated Huffner from their company." *Id.* ¶ 133, 142; *see also id.* ¶ 151, 161.

l.  "Mrs. Collier knew her representations to Brown were false or made with reckless disregard for the truth." *Id.* ¶ 134, 143; *see also id.* ¶ 152, 162.

m.  "Mrs. Collier abused her relationship with Brown when she misrepresented through her misstatements and omissions the condition of the Everglades Parcel and Huffner's suspension and ultimate termination to Brown." *Id.* ¶ 172.

41.    Ms. Collier made no fraudulent misrepresentations or concealed facts from Ms. Brown in connection with the Everglades land.

42.    Nor did Ms. Collier lie to Brown about Mr. Huffner's employment status; she did not omit or misrepresent that Mr. Huffner had been suspended and the terminated from Collier Enterprises.  As Ms. Brown knew, Ms. Collier was not involved in the management of Collier Enterprises.

43.    In the First Amended Complaint, Ms. Brown also made false statements that Ms. Collier improperly engineered Ms. Brown's termination from Collier Enterprises, including:

a.    "Concerned about the possible consequences of the questions and alleged corruption Brown had raised, as well as her fear that Brown would eventually learn the full truth about the creosote contamination, Mrs. Collier began to view Brown as an existential threat. As a result, she engineered her sudden termination at the peak of her responsibilities at Collier Enterprises, tortiously interfering with Brown's business relationship and contract with Collier Enterprises." *Id.* ¶ 8.

b.    "Mrs. Collier perceived Brown's efforts toward identifying and reporting malfeasance within Collier Enterprises as detrimental to the prospective Everglades and Rivergrass deals. Upon information and belief, Mrs. Collier feared that if the truth about the contamination on the Everglades Parcel and Huffner's malfeasance came to light, it could jeopardize the success of both the Everglades and Rivergrass land deals, dramatically decreasing the value of Collier Enterprises to a potential buyer." *Id.* ¶ 46.

     c.   "As a result, Mrs. Collier wielded her marriage and advisory role to Collier Enterprises' co-owner and her ongoing interjections into Company affairs to engineer the termination of Brown, thereby intentionally and unjustifiably interfering with Brown and Collier Enterprises' contractual and business relationship. Parker Collier's intentional interference in Brown and Collier Enterprises' contractual and business relationship was done in bad faith and with malice." *Id.* ¶ 48.

     d.   "Mrs. Collier engineered [Brown's] sudden termination." *Id.* ¶ 68.

44.    To be clear, Ms. Brown was not an employee of Collier Enterprises. And Ms. Collier did not interfere with any alleged contractual or business relationship between Ms. Brown and Collier Enterprises.

45.    Further, Ms. Collier was not involved in Collier Enterprises' decision to end its relationship with Ms. Brown. As Ms. Brown states herself, Ms. Collier was not involved in the business operations of Collier Enterprises.

46.    Through Ms. Brown's use of her media relations consultant(s) to promote the unredacted First Amended Complaint, several defamatory statements were widely and excessively disseminated via news stories. Specifically, articles inaccurately stated that Ms. Collier and Collier Enterprises sold 8,000 acres of land contaminated with deadly creosote in the Everglades to the State of Florida in May 2023, including:

     a.   "This case centers on a businesswoman and matriarch of a powerful Florida family, Parker Collier, and the unlawful acts she perpetrated to enrich herself by engineering the promotion and sale of 8,000 acres of land contaminated with deadly

creosote in the Everglades ("Everglades Parcel") in May 2023. Not only did this sale relieve the Colliers of the burden of continued remediation obligations under the decades-long Consent Decree they signed with the State of Florida ("Consent Decree"), but Mrs. Collier and her family actually made money from the polluted land—nearly $30 million."  *See* Ex. 1 ¶ 1.

b.  "To the contrary, Mrs. Collier falsely told Brown that the creosote contamination, which she said had happened a long time ago, had been cleaned up."  *Id.* ¶ 2.

c.  "[T]he Everglades Parcel that Mrs. Collier was determined to dump was toxic. As recent testing near the Everglades Parcel reveals, the land is *still* polluted with creosote."  *Id.* ¶ 5.

d.  "[U]pon information and belief, [the Colliers] never disclosed the land's toxic history and ongoing contamination to government officials."  *Id.*

e.  "Upon information and belief, offloading the contaminated property would not only permit them to make a lucrative sale, but also would insulate the Colliers from future penalties and a potential million-dollar clean-up if the partially-remediated site was ever rediscovered."  *Id.* ¶ 20.

f.  "As Brown eventually became aware, Collier Enterprises wanted to dispose of the contaminated property expeditiously so as to make the ultimate sale of the Company's assets more attractive to Tarpon Blue, the potential private buyer."  *Id.* ¶ 83.

g.  "Mrs. Collier directed Brown not to discuss the creosote history as the explosion had happened long ago and was dealt with."  *Id.* ¶ 89.

h.  "[Mrs. Collier] knowingly misrepresented that the contamination has been cleaned up and omitted crucial facts as to the polluted condition of the property so as to induce Brown to continue to be associated with and promote the sale of the property.  Driven by her goal to offload the contaminated property—a deal that would directly benefit here—Mrs. Collier lied to Brown.  Her intent was to discourage Brown from asking more questions and potentially derailing the land acquisition by unearthing the extent of the contamination of the Everglades Parcel and the Collier Family's efforts to cover it up."  *Id.*¶ 91.

***Brown Ensures Her Defamatory Statements Make Headlines***

47.    Ms. Brown's allegations were pled for improper purposes. Ms. Brown used the protective of litigation privilege to defame Ms. Collier free of consequences.

48.    Ms. Brown then worked to increase her leverage by going beyond the litigation and threatening to use her media relations representatives to promote the unredacted First Amended Complaint.

49.    Ms. Collier did not succumb to Brown's threats.

50.    Ms. Brown went through with her threats and promoted the unredacted First Amended Complaint to various media outlets.  Ms. Brown believed that this conduct too would be protected. Through Ms. Brown's efforts to shop the First Amended Complaint around, her defamatory statements regarding the nature of the land sold to Florida became widely and excessively publicized across Florida and the United States.

51.    On July 5, 2024, The Miami Herald published an article by Alexandra Glorioso, titled "Powerful Florida family sold DeSantis administration toxic land, lawsuit alleges."  *See*

**Exhibit 2**; *see also* **Exhibit 3**.  The article begins: "Last year, the state of Florida purchased more than 11,000 acres for nearly $30 million from the powerful Collier family near Everglades City for conservation.  Now, a former employee of Parker J. Collier — the matriarch of the family from which Collier County gets its name — claims most of that land is toxic."  The article quotes Brown's amended complaint, stating "'This case centers on a businesswoman and matriarch of a powerful Florida family, Parker Collier, and the unlawful acts she perpetrated to enrich herself by engineering the promotion and sale of 8,000 acres of land contaminated with deadly creosote in the Everglades.'"  It goes on to state that "Brown contends that Collier never disclosed the contamination to the state."  This article remains on The Miami Herald website, and the Google search that brings it up includes the summary: "Parker Collier misrepresented the contamination of the Green Heart of the Everglades land while selling it in 2020, former employee claims."

52.     The Naples Daily News published a similar article by Amy Bennett Williams on July 11, 2024, titled "Florida was tricked into buying toxic land by ultra-rich Collier family, whistleblower says."  *See* **Exhibit 4**.  The article states "Florida was duped into buying conservation land tainted with creosote, a toxic wood preservative linked to cancer and birth defects in a deal hailed as an environmental win, says a lawsuit unsealed in federal court last month."  *Id.*  The article also states: "Brown alleges: the Colliers, who once owned more than a million Southwest Florida acres, got richer by unloading tainted land onto taxpayers while relieving themselves of polluted property."  *Id.*  The article quotes Brown's amended complaint, stating "'Mrs. Collier falsely told Brown that the creosote contamination, which she said had happened a long time ago, had been cleaned up.  And despite knowing that Brown would be interacting with President Donald Trump and senior White House and campaign staff, as well as

Governor Ron DeSantis and his senior team, regarding the acquisition, she told Brown not to discuss the creosote during her meetings.'" *Id.* This article remains on The Naples Daily News website, and the Google Search that brings it up includes the summary: "A whistleblower who worked closely with matriarch Parker Collier for more than a decade, says the powerful family hid dangerous Everglades. . . ."

53.    USA Today picked up and published The Naples Daily News article on July 16, 2024. *See* **Exhibit 5**.

54.    Many other news outlets published similar articles, all of which focus on Brown's defamatory allegations regarding the land sold to Florida. These include (i) "Federal suit alleges Collier family sold contaminated land to state," published by WGCU (PBS and NPR for Southwest Florida) on June 28, 2024; (ii) "Influential Florida family sold the state thousands of acres of likely contaminated land," written by Hector Rios Morales and published in The Latin Times on June 9, 2024; (iii) Politico's "Florida Playbook," written by Kimberly Leonard and published July 8, 2024.

### *Knowledge of Falsity*

55.    Ms. Brown was aware that Ms. Collier was not involved in the sale of the Everglades land in any way.

56.    Through her knowledge of Collier Enterprises, Ms. Brown was aware that Ms. Collier did not make any money from the sale of the Everglades land. Upon information and belief, Ms. Brown did not take reasonable care to determine whether Ms. Collier made any money from the sale of the Everglades land.

57.    Critically, the land was sold after the Colliers parted ways with Ms. Brown. Ms. Brown had no knowledge of the terms of the sale.

58.     Ms. Brown did not take reasonable care to determine whether the land was contaminated.  While Ms. Brown purports to rely on testing results from Dr. James Dahlgren for her conclusion that the land was contaminated, *see* Ex. 1 ¶ 102, she either did not rely on Dr. Dahlgren's testing, or her reliance was unreasonable.

59.     Ms. Brown acted with reckless disregard as to the falsity of her statements that the Everglades land was contaminated.  Ms. Brown alleges that she conducted "testing of land immediately adjacent to the Everglades Parcel" on two random days in May and June of 2024 and claims that the testing results were reviewed by Dr. James Dahlgren.  Based on her testing of adjacent land, Ms. Brown concludes that "the land is *still* polluted with creosote," and that the Colliers "never disclosed the land's toxic history and ongoing contamination to government officials."  Ms. Brown's statements are almost as ignorant and fanciful as they are false.  Ms. Brown contends that she, a self-proclaimed "veteran government relations specialist and strategic communications expert," was able to discover alleged creosote contamination that was undetected by the State of Florida when purchasing the land for nearly $30 million.

60.     Similarly, Ms. Brown's allegations that Ms. Collier hid the history of creosote contamination is also false.  To begin, Ms. Collier was not involved in the sale of the land, a fact Brown was well aware of.  Second, as alleged in the complaint, the State of Florida was already aware that "a coal tar creosote wood preservative was released to the ground and/or ground water" in surrounding areas.  Ms. Brown's knowledge of the relevant Consent Decree from the State of Florida establishes that she knew the falsity of her statements.

61.     Ms. Brown was also aware that Ms. Collier was not involved in the decision by Collier Enterprises to end its economic relationship with her.  Ms. Brown knew that Ms. Collier

was not a decisionmaker at Collier Enterprises.  Her wrongful termination suit was nothing more

than an attempt to tarnish Ms. Collier's name and mend Ms. Brown's bruised ego, which cannot

accept that Collier Enterprises might want to end its relationship with her.  Ms. Brown's delusions

and unfounded accusations are not reasonable.  Ms. Brown did not exercise proper care to

determine whether Ms. Collier was involved in Collier Enterprises' decision to end its relationship

with Ms. Brown.

### *As a Direct Result of Brown's Defamatory Statements, Ms. Collier Has Suffered and Continues to Suffer Serious Harm*

62.     Ms. Brown's statements and actions have caused, and continue to cause, enormous

harm to Ms. Collier.

63.     Prior to Ms. Brown's vindictive and retaliatory legal filings, Ms. Collier enjoyed a

reputation as a well-respected, ethical, truthful, and professional individual within her community

and beyond.  But Ms. Brown's tortious and egregious conduct towards Ms. Collier has caused her

devastating and irreparable reputational harm.

64.     Specifically, the false and defamatory allegations spread by Ms. Brown have

damaged Ms. Collier's reputation in the eyes of community members who have been directly

exposed to these false allegations and discussion in news stories.

65.     Ms. Collier's reputation has taken a hit in her personal life as well; the untrue

accusations have spread to colleagues and friends, both casual and close, and to Ms. Collier's

family members.  These reputational injuries are likely to continue and expand.

66.     As a direct result of Brown's tortious actions, Ms. Collier has suffered severe

distress and harm to both her physical and emotional health.

67.    Ms. Collier has suffered substantially from the egregious actions by Brown against her, much of which can never be undone.

**FIRST CLAIM FOR RELIEF**
**Defamation and Defamation *Per Se***

68.    Ms. Collier repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

69.    Ms. Brown has engaged in a determined campaign of defamation and character assassination against Ms. Collier.  Ms. Brown has employed written communications to advance her objective of damaging Ms. Collier's reputation and relationships.

70.    Ms. Brown has carried out this campaign via false and disparaging statements about Ms. Collier, which she has disseminated to news outlets and to the public via news outlets, including but not limited to, The Miami Herald, The Naples Daily News, and USA Today.  The false statements in these communications are listed and described above.

71.    The statements set forth in these communications are numerous, but they together assert a number of facts which are materially false and highly damaging.  These include, but are not limited to:

   a.   Ms. Collier tricked Florida into buying contaminated land;

   b.   Ms. Collier profited by selling contaminated land to Florida;

   c.   Ms. Collier lied to Ms. Brown about the creosote contamination and Huffner's employment;

   d.   Ms. Collier directed Ms. Brown to conceal information about the property's creosote history;

   e.   Ms. Collier engineering the sale of deadly contaminated land; and

f.   Ms. Collier improperly engineered the termination of Ms. Brown's business relationship with Collier Enterprises.

72.   As Ms. Brown knew when she published them, the above statements are false.

73.   Ms. Brown published the statements excessively to more persons than needed to bring her lawsuit against Ms. Collier by maliciously using her media relations representatives to promote the unredacted First Amended Complaint.  Through her efforts, the defamatory statements in the First Amended Complaint were disseminated to multiple news outlets and became well publicized across a variety of sources.

74.   The statements call into question Ms. Collier's honesty, integrity, virtue, and/or reputation.  The statements expose Ms. Collier to public hatred, contempt, or ridicule in the eyes of the people to whom they were published and therefore tend to harm her reputation so as to lower her in the estimation of the community or to deter third persons for associating or dealing with her.

75.   Indeed, Ms. Brown's false accusations have lowered Ms. Collier in the estimation of her community, friends, colleagues, and other and have deterred people from associating or dealing with her.

76.   The statements above are defamatory *per se* in that they accuse Ms. Collier of serious misconduct and breaches of integrity.  These accusations involve allegations of Ms. Collier engaging in illegal conduct.  And Ms. Collier is a significant landholder in locations throughout the United States—land that she wishes to eventually sell and now must do so under the cloud of Ms. Brown's allegations concerning fraudulent land sales.

77.   By publication of these communications, Ms. Brown caused harm to Ms. Collier's reputation.

78.     Ms. Brown did not take reasonable care to determine whether her written statements were true and published her written statements with a reckless disregard for the truth, in that she was aware at the time of publication that the statements were false or, at a minimum, had a high degree of awareness that the statements were probably false.

79.     As a direct and proximate result of the publication of the false and defamatory statements, Ms. Collier has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and special and economic damages, in an amount to be determined at trial.

80.     Ms. Brown published the false and defamatory statements about Ms. Collier intentionally, willfully, maliciously, and in conscious disregard of Ms. Collier's rights and reputation and of the truth, and punitive damages are warranted.

## SECOND CLAIM FOR RELIEF
### False Light Invasion of Privacy

81.     Ms. Collier repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

82.     Ms. Brown made numerous disparaging statements about Ms. Collier, as set forth above.

83.     These statements were made to a large number of people, many of whom have connections with Ms. Collier, including members of her business network, members of her community, and various friends and family members.

84.     Ms. Brown knew and intended that her statements would be disseminated broadly and received by these various groups of people.

85. Ms. Brown's statements invaded Ms. Collier's privacy by painting her in a false light before the public.

86. Ms. Brown knew or should have known that her statements would be highly offensive to Ms. Collier, or any reasonable person about whom such statements were made.

87. The highly offensive statements made by Ms. Brown are summarized above in paragraph 71.

88. Ms. Brown at all relevant times knew such statements were in fact false, or at a very minimum acted in reckless disregard for the truthfulness of such statements.

89. Ms. Brown knew and intended that such statements would cause harm to Ms. Collier.

90. Ms. Brown published the statements to more persons than needed to bring her lawsuit against Ms. Collier by maliciously using her public relations representatives to promote the unredacted First Amended Complaint. Through her efforts, the defamatory statements in the First Amended Complaint became well publicized across a variety of sources.

91. As a direct and proximate result of the publication of these statements, Ms. Collier has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

92. Ms. Brown published the statements about Ms. Collier intentionally, willfully, maliciously, and in conscious disregard of Ms. Collier's rights and reputation and of the truth, and punitive damages are warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Parker J. Collier respectfully requests that that Court enter judgment in her favor and against Sonja Eddings Brown and award her relief against Ms. Brown as follows:

93.    Actual and compensatory damages resulting from Ms. Brown's defamation of Ms. Collier, exceeding $75,000, in an amount to be proven at trial;

94.    Actual and compensatory damages resulting from Ms. Brown's false light invasion of privacy against Ms. Collier;

95.    An award of interest, reasonable attorneys' fees, and costs, as allowed by law;

96.    Punitive damages, as allowed by law; and

97.    Such other and further relief as the Court deems appropriate.

## REQUEST FOR JURY TRIAL

Plaintiff Parker J. Collier demands trial by jury for all claims and issues that are so triable.

DATED: June 24, 2025

KUNZLER BEAN & ADAMSON, PC


*/s/ Ryan B. Bell*
Ryan B. Bell

**MCDERMOTT WILL & EMERY LLP**

Michael S. Nadel (*pro hac vice* forthcoming)
Jenny Lee (*pro hac vice* forthcoming)
Rachel M. Peltzer (*pro hac vice* forthcoming)

*Attorneys for Plaintiff Parker Collier*