# <u>Exhibit 1</u>
# to Verified Complaint

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| Sonja Eddings Brown,<br><br>      Plaintiff,<br><br>v.<br><br>Parker J. Collier,<br><br>      Defendant. | Case No. 2:24-cv-00369-JLB-NPM<br><br>**UNREDACTED FIRST AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sonja Eddings Brown ("**Plaintiff**" or "**Brown**"), by and through undersigned counsel, brings the above-captioned action against Defendant Parker J. Collier ("**Defendant**" or "**Mrs. Collier**"), and alleges as follows:

### NATURE OF THE CASE

1.      This case centers on a businesswoman and matriarch of a powerful Florida family, Parker Collier, and the unlawful acts she perpetrated to enrich herself by engineering the promotion and sale of 8,000 acres of land contaminated with deadly creosote in the Everglades ("**Everglades Parcel**") in May 2023.  Not only did this sale relieve the Colliers of the burden of continued remediation obligations under the decades-long Consent Decree they signed with the State of Florida ("**Consent Decree**"), but Mrs. Collier and her family actually made money from the polluted land—nearly $30 million.

1

2.      To further this illicit scheme, Mrs. Collier fraudulently misrepresented to and concealed material facts from Plaintiff Sonja Brown, a veteran strategic communications and government relations expert whom Mrs. Parker and the Collier family had hired to manage a variety of business and personal matters for over a decade.  Specifically, Mrs. Collier hid from Brown that the Everglades Parcel she was promoting to federal and state officials had suffered an explosion that caused 3,000 gallons of creosote—a toxic wood preservative known to cause cancer, birth defects and other illnesses—to contaminate the property and the drinking water of residents in the surrounding area. To the contrary, Mrs. Collier falsely told Brown that the creosote contamination, which she said had happened a long time ago, had been cleaned up.  And despite knowing that Brown would be interacting with President Donald Trump and senior White House and campaign staff, as well as Governor Ron DeSantis and his senior team, regarding the acquisition, she told Brown not to discuss the creosote during her meetings.

3.      In so doing, Mrs. Collier tortiously interfered with Brown's contractual and business relationship with Collier Enterprises, Inc. ("**Collier Enterprises**" or the "**Company**"), a lucrative conglomerate co-owned by Mrs. Collier's husband, Miles Collier, and her brother-in-law, Barron Collier II.  In a nutshell, Mrs. Collier was driven by ambition and malice.

4.      As Brown only recently came to learn well after her termination, Mrs. Collier sought to conceal the fact that the Everglades Parcel had not been fully

cleaned up because she did not want anything to undermine her efforts and those of her family to unload the property to the federal or state governments.  Upon information and belief, the sale of the contaminated land would free the Collier family from the obligations of the Consent Decree, and enable them to sell their holdings to a private buyer without the risk of legal exposure.  Importantly, a sale would also give Mrs. Collier control over the assets of her husband, Miles Collier, which were now tied up in the company he co-owned with her brother-in-law Barron Collier II—a man with whom she had a contentious relationship and who, upon information and belief, had sought to restrict Mrs. Collier's ability to participate in the company's business.

5.     There was only one problem: the Everglades Parcel that Mrs. Collier was determined to dump was toxic. As recent testing near the Everglades Parcel reveals,  the land is *still* polluted with creosote, a fact experts say is not surprising given how toxic creosote is and how long it persists in the soil and groundwater. Indeed, during two separate testings on random days in May and June 2024, as many as eight separate compounds associated with creosote regulated by the EPA were detected in a drinking well near to the Everglades Parcel that the Colliers sold to the State of Florida.  These chemicals are known to cause cancers, birth defects, and other illnesses.  Yet, there is no mention of creosote in the May 11, 2023 Agreement for Sale and Purchase that the Colliers executed with the South Florida Water Management District ("**Sale Agreement**"), and, upon information and

belief, they never disclosed the land's toxic history and ongoing contamination to government officials.

6.    Equally as troublesome, almost as soon as the Colliers inked the deal with the State of Florida to sell this polluted land, upon information and belief, they stopped providing the residents the gallons of bottled water the Consent Decree required, leaving them to drink water that the National Park Service declared should not be used.  Nor, upon information and belief, had the Colliers complied with the Consent Decree's mandate to develop a "potable alternative water supply."  As a result, Mrs. Collier and her family profited from the polluted land while leaving residents at risk of exposure to toxic chemicals in the water they drink, cook,  and shower with.

7.    These were not Mrs. Collier's only fraudulent acts.  As set forth more fully below, she also misrepresented and concealed material facts related to the Colliers' second business objective: securing local government approval to develop a portion of Collier land into residential and mixed-use developments, the largest of which was the Rivergrass Development ("**Rivergrass**").  In particular, between September 2019 and January 2020, Brown—as a whistleblower—reported to Collier Enterprises senior management that Don Huffner, the Company's CEO, was engaged in corruption in securing approvals from Collier County Commissioners regarding the Rivergrass development. Thereafter, Mrs. Collier falsely told Brown that the Colliers had suspended and ultimately terminated Huffner.  She did so to induce Brown to inform government officials and other

prominent leaders who had complained about Huffner's conduct that the Colliers had addressed the problem by removing him from the Company. But once again, this information was false. As Brown later learned, Huffner was still working for and receiving compensation from the Collier businesses even after, upon information and belief, he received a payout of approximately $4 million.

8.    Concerned about the possible consequences of the questions and alleged corruption Brown had raised, as well as her fear that Brown would eventually learn the full truth about the creosote contamination, Mrs. Collier began to view Brown as an existential threat. As a result, she engineered her sudden termination at the peak of her responsibilities at Collier Enterprises, tortiously interfering with Brown's business relationship and contract with Collier Enterprises. Mrs. Collier's unlawful conduct deprived Brown of valuable economic and professional benefits; compromised her reputation with the White House, Cabinet members, the State of Florida, other government officials, and prominent members of the Florida community; caused her emotional harm; and placed her in possible legal jeopardy.

9.    Brown brings this action to rectify the harms caused by Mrs. Collier's interference with Brown's contract and business relationship with the Company, fraudulent and negligent misrepresentations, fraudulent concealment, fraudulent inducement, and constructive fraud.

## PARTIES, JURISDICTION, AND VENUE

10.    Plaintiff Sonja Eddings Brown is an individual and resident of Utah.

11.    Defendant Parker Collier is an individual and resident of Florida.

12.    This Court has jurisdiction over the above-captioned action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.    This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), because she is a Florida resident and therefore subject to the jurisdiction of a court of general jurisdiction within the State of Florida.

14.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred within this District.

**FACTUAL BACKGROUND**

***Parker Collier and the Collier Family***

15.    For much of the 20th century, Barron Gift Collier I and his family were the largest private landowners in Florida.  In fact, in 1923, the Florida Legislature named Collier County after Barron Collier I.

16.    In 1976, Barron Collier I's grandchildren split up his company and grandsons Miles Collier and Barron Collier II founded Collier Enterprises, Inc. ("**Collier Enterprises**" or "**Company**").  Throughout the years, the Company not only continued to own large swaths of land in Southwest Florida, but it also

amassed a portfolio of real estate holdings and investments across the United States.

17.     The Company owned various related entities, including Collier Development Corporation ("**Collier Development**"), which also amassed real estate holdings nationally.

18.     Mrs. Collier, a business owner and an important figure in the Collier Family, is Miles Collier's wife and one of his principal business advisers.  However, upon information and belief, due to longstanding personal and professional conflicts between Mrs. Collier and Barron Collier II, Collier Enterprises formally prohibited Mrs. Collier from making decisions on the Company's behalf, a directive she routinely ignored.  Indeed, given her marriage to Miles Collier, Mrs. Collier still wielded significant influence that led to her malicious interference with Brown's contract and business relationship and enabled her to engage in fraudulent conduct that furthered her financial goals.

19.     Upon information and belief, and as discussed herein, Mrs. Collier was eager for her husband and Barron Collier II to sell Collier Enterprises and liquidate its assets, which would give her access and more control over Miles Collier's share of the proceeds.  First, the Colliers sought to sell the Everglades Parcel, an 8,000-acre land parcel located in the Everglades in Southwest Florida to a government buyer.  Decades ago, the parcel had been contaminated due to the prolific use of creosote preservative on the property while under the ownership of the Collier family.

20.    Upon information and belief, offloading the contaminated property would not only permit them to make a lucrative sale, but also would insulate the Colliers from future penalties and a potential million-dollar clean-up if the partially-remediated site was ever rediscovered. Moreover, by offloading the Everglades Parcel before they sold all of their land holdings to the Tarpon Blue Family of Companies ("**Tarpon Blue**"), Collier Enterprises would avoid any legal exposure during their transaction with Tarpon Blue.

21.    Meanwhile, the Colliers also worked to secure government approval to develop some of their land in eastern Collier County into 'villages' comprising thousands of residential and mixed-use developments. Rivergrass, the first of such developments, would represent the crown jewel of the Colliers' real estate investments, making liquidation of all other assets ever more attractive and lucrative. Upon information and belief, securing local government approval to develop this land would make Collier Enterprises more attractive to buyers.

### *Sonja Brown*

22.    Brown is a veteran government relations specialist and strategic communications expert. She began her career in media as a television newswoman and network producer for each of the major broadcast networks and as an advertising writer and producer. Thereafter, Brown became a government and communications strategist for top brands, political campaigns, and family offices.

23.    Given her work ethic and penchant for fair and honest dealings, Brown had tremendous success for decades as a government relations and

communications specialist, allowing her to develop an enviable network of personal and professional connections—including at the highest levels of federal and state government.

24.    Brown and Mrs. Collier met at an event in 2010.  They formed a connection based on their shared support of charities for women and public education, developing a friendly relationship with one another.

25.     As their personal relationship progressed, Brown began to informally work for Mrs. Collier. Between 2016 and 2018, Brown regularly advised and assisted Mrs. Collier and was on-call for a variety of projects and tasks related to Mrs. Collier's personal and professional affairs.   Brown would often attend meetings and local political events as Mrs. Collier's representative and was even trusted by Mrs. Collier to supervise her contractors.

26.    Over the course of their decade-long relationship, Brown became a close confidant of Mrs. Collier, who frequently shared personal information regarding herself, the Collier family, her consultations with her numerologist, and her ambitious business and financial goals.

27.    Eventually, because of Mrs. Collier's expressed need for Brown's select skills, Brown entered into a formal business relationship with the Collier Family and remained an adviser to Mrs. Collier.

### *Brown's Business Relations with Collier Enterprises*

28.    From 2016 until her termination in April 2020, Brown maintained a successful business relationship with Collier Enterprises.   Building on her

successful track record, Brown's responsibilities increased.  Beginning in 2019, Brown represented the Collier family's interests in, among other matters, high-level government meetings regarding some of its most significant interests, including to (1) promote the sale of the Everglades Parcel and (2) secure and defend Collier County's approval to develop, among other properties, Rivergrass. Upon information and belief, these two deals would substantially increase Collier Enterprises' market value, allowing the Colliers to reap a greater windfall from the anticipated  sale of the business.

29.    Between July 2019 and February 2020, Brown continued to perform work for Collier Enterprises on the Everglades Parcel and the Rivergrass development pursuant to her preexisting business relationship with the Company—but without all of the terms of their business relationship set forth in a written contract.  Instead, in July 2019, Brown signed a preliminary one-page draft ("**July 2019 Document**") that was presented and intended strictly as a placeholder in advance of an actual contract that would be consistent with Brown's true role within the Company.   The document itself acknowledged that "discussions will continue" about further "incentive compensation fees" for Brown in connection with her work in respect of the land sale.  The document was signed by Robert E. Gipson on behalf of "Collier Affiliated Companies."  Throughout her employment, Brown received $15,000.00 per month while working on non-profit endeavors.  She expected to receive additional compensation commensurate with her separate and escalating leadership role and responsibilities at Collier

Enterprises, including a success fee for promoting the sale of the Everglades Parcel and for her pivotal role in the Rivergrass development and sale.

30.    By January 2020, Brown had been so successful in her work that Miles Collier gave her a formal title more appropriate for her level of responsibility including representing the Collier family and Collier Enterprises to federal and state government officials.  Brown was promoted to Director of Government Relations at Collier Enterprises, where her responsibilities increased and where she ultimately was charged with managing all of the Company's intergovernmental relations and steering its political giving.

### Brown's February 2020 Contract with Collier Enterprises

31.    On February 14, 2020, Brown expected to execute a contract with Collier Enterprises.  When she arrived for the meeting, she was whisked away by two executives of Collier Enterprises into a small room and presented with a different contract that she had not previously seen.  Despite the fact that Brown had never seen this new contract, which contained some materially different terms, and had no opportunity to obtain outside advice, she was told she could not leave until she had signed the document.  One of the executives, Collier Family Office President Bill Thomas, further told Brown that the agreement was merely a "placeholder for ongoing negotiations." Under these difficult circumstances, Brown executed a contract with Collier Enterprises Management, Inc. on February 14, 2020 ("**February 14 Contract**").

32.    The February 14 Contract gave Brown substantial responsibilities, including by: continuing to advance and facilitate land sales; building Collier Enterprises' relationships with federal, state, and local decisionmakers; creating a political action committee and steering the Company's political giving; developing public-relations strategies; and establishing budgets. Collier Enterprises agreed to pay Brown only a salary of $15,000.00 per month, a rate well below her skills, expertise, and level of responsibilities.

33.    However, even after Brown and Collier Enterprises executed the February 14 Contract, Brown undertook additional responsibilities that were not set forth in the February 14 Contract, including work for Mrs. Collier specifically, for which Brown expected to be but was not compensated. Brown's work included:

   a. Managing certain philanthropic and community relationships on Mrs. Collier's behalf, including by liaising with stakeholders, securing outreach opportunities, and representing Mrs. Collier at board events. While attending events on Mrs. Collier's behalf, Brown created relationships and secured business for Mrs. Collier's business endeavors.

   b. Facilitating the sale of Mrs. Collier's Lamborghini.

   c. Performing various projects for Mrs. Collier including consulting and training numerous personnel who worked for Mrs. Collier.

   d. Coordinating the Collier family's personal political giving (separate from Collier Enterprises).

    e.  Communicating on Mrs. Collier's behalf with potential business partners.

    f.  Assisting with business opportunies for Mrs. Collier's family members, including by evaluating an athletic contract for Mrs. Collier's daughter and developing a website for Miles Collier's book.

    g.  Creating a "National Security Salon" to be held at Mrs. Collier's ranch comprised of attendees from Brown's network.

    h.  Consulting on a marketing strategy for products produced at the Collier Vermont Farm.

34.    In fact, in March 2020, a month before Brown's termination, the Colliers asked Brown to hold herself out as the "new face" of Collier Enterprises, alongside Interim CEO Don Whyte.

35.    Brown undertook these responsibilities pursuant to the preexisting business relationship she had with Collier Enterprises and the Collier family, and with the expectation that she would be paid an additional remuneration or success fee when the sales of the Everglades Parcel and the Rivergrass project went through.

36.    The customary success fee for a sale of land on the scale of the Everglades Parcel would be approximately 5-10% of the value of the sale. The Everglades Parcel ultimately sold for approximately $29,500,000, which means that Brown's success fee would have been, at a minimum, approximately $1.5–3 million. However, given the significant work Brown did to further the land deals,

13

as well as the compensation of other executives at Collier Enterprises, Brown's compensation would likely have been at the higher end or surpassed this range. Upon information and belief, other executives at Collier Enterprises who were tasked with similar responsibilities as Brown, were eligible for fees on successful land transactions of 30% of the gross, as well as an approximately $300,000 per year salary.

### *Mrs. Collier Misrepresents Huffner's Termination*

37.     Mrs. Collier knew about the existence of the business relationship as well as the February 14 Contract between Brown and Collier Enterprises by virtue of her longstanding personal and professional relationship with Brown and because of her marriage to Miles Collier, who then co-owned Collier Enterprises with his brother, Barron Collier II.

38.     Brown took her role seriously.  Among her many responsibilities, she diligently engaged in efforts to protect Collier Enterprises' business and legal interests by seeking to ensure that the Company's executives did not engage in conduct that ran afoul of federal, state, and local laws and regulations.

39.     As part of these efforts, Brown discovered and officially reported as a whistleblower to Collier Enterprises that its former CEO, Don Huffner, was engaged in misconduct and malfeasance in the context of the Company's efforts to secure the Everglades Parcel sale and Collier County's approval of the Rivergrass plan.  In particular, Brown contemporaneously reported to Collier Enterprises her

discoveries that Huffner made inappropriate gifts and *quid pro quo* solicitations to state and local government officials.

40.    Although Brown warned Huffner of his ethical obligations, the misconduct worsened to the point that senior members of the Florida Governor's staff expressed concerns about Huffner's misconduct.

41.    Despite Brown's repeated reports of Huffner's malfeasance to senior Collier executives, upon information and belief, neither Collier Enterprises nor the Colliers themselves took any action against Huffner.

42.    Upon information and belief, it was not until on or about February 1, 2020, after having received complaints from senior aides of Governor DeSantis regarding Huffner's conduct, that the Colliers confronted Huffner.

43.    Mrs. Collier then knowingly misrepresented to Brown that Huffner had been suspended and then fired.   Fearing that public exposure of Huffner's misconduct might derail Rivergrass in the days leading up to the vote by the Collier County Commission, Mrs. Collier directed Brown and her colleague, Interim CEO Don Whyte, to publicly announce Huffner's separation from Collier Enterprises. Relying on Mrs. Collier's representation and having no reason to believe the Colliers would be lying about terminating their CEO, Brown disclosed to the government officials involved in the Rivergrass and Everglades Parcel deals, who had complained about Huffner's conduct, that Huffner had left the Company.

44.     Brown was shocked to later learn that Mrs. Collier had lied to her and that Huffner had not been terminated and was still very much engaged in the business affairs of Collier Enterprises.  This discovery and the realization that she had unwittingly misrepresented Huffner's termination to government officials and other prominent individuals as a result of Mrs. Collier's deception, created exposure for Brown and harmed her reputation.

### *Mrs. Collier Engineers Brown's Termination*

45.     During this time, Brown continued to be actively supervising the progress of the Everglades Parcel.  As a result, she occasionally inquired about its history, which could have unwittingly uncovered the lingering pollution on the property and the Collier family's role in the inadequate remediation.

46.     Mrs. Collier perceived Brown's efforts toward identifying and reporting malfeasance within Collier Enterprises as detrimental to the prospective Everglades and Rivergrass deals.  Upon information and belief, Mrs. Collier feared that if the truth about the contamination on the Everglades Parcel and Huffner's malfeasance came to light, it could jeopardize the success of both the Everglades and Rivergrass land deals,  dramatically decreasing the value of Collier Enterprises to a potential buyer.

47.     Therefore, even though Mrs. Collier initially facilitated Brown's introduction to Collier Enterprises and handpicked Brown to lead the Everglades

Parcel acquisition, she now viewed Brown as a liability for the Collier family and their financial interests.

48.   As a result, Mrs. Collier wielded her marriage and advisory role to Collier Enterprises' co-owner and her ongoing interjections into Company affairs to engineer the termination of Brown, thereby intentionally and unjustifiably interfering with Brown and Collier Enterprises' contractual and business relationship.   Parker Collier's intentional interference in Brown and Collier Enterprises' contractual and business relationship was done in bad faith and with malice.  In fact, as pictured below, following Brown's termination, Mrs. Collier sent Brown a napkin with an embroidered skull and crossbones.   Alongside the threatening napkin was a note next: "Persistent Proficient Performance."




64.   Following her termination, Brown suffered a series of threats to her physical safety and that of her family.   All the threats to the Browns were immediately reported to law enforcement authorities.

65.    As a direct result of Mrs. Collier's unlawful conduct, Brown suffered loss of income pursuant to her contractual relation with Collier Enterprises. She was also deprived the incentive compensation Mrs. Collier, Miles Collier and the agents of Collier Enterprises repeatedly assured her that she would be granted for leading the effort to secure the sale of the Everglades Parcel, promote the Rivergrass development, and other contributions. Brown also suffered emotional distress and irreparable harm to her professional reputation at all levels, from the sudden and unexpected termination of her job to her inability to work in her area of expertise since her termination.

66.    Parker Collier has benefitted significantly from her interference with Brown's contractual and business relationship because, by having Brown fired, she was able to conceal the misconduct and malfeasance in which the Colliers were engaged with respect to the Everglades Parcel and Rivergrass, thereby facilitating the ultimate lucrative sale of Collier Enterprises to Tarpon Blue on October 17, 2022.

67.    Notably, the sale of Collier Enterprises has netted Mrs. Collier significant personal benefits—entirely separate from those that accrued to the Company. Upon information and belief, before the sale, Barron Collier II, had precluded Mrs. Collier from any involvement in the Company's business although, as evidenced here, she often ignored this directive. The sale of the Company was, therefore, more than merely a financial boon to Mrs. Collier. It not only enriched the Company in which her husband held a direct economic stake; upon

information and belief, it also transformed her husband's interest in that Company into assets over which Mrs. Collier could exercise direct control. Mrs. Collier frequently confided in Brown her goal of obtaining control over such assets in the event Miles Collier died. Mrs. Collier should not be permitted to retain these ill-gotten gains, obtained as a direct and proximate result of her tortious conduct against Brown.

### *Mrs. Collier Omits the True History of the Everglades Parcel*

68.    Brown was left in the dark as to why Mrs. Collier engineered her sudden termination, until she began to piece together the history and condition of the Everglades Parcel, the sale of which was one of Brown's chief responsibilities pursuant to the aforementioned business relationship with the Collier family's business enterprise.

69.    The town of Jerome, Florida, is located in eastern Collier County, as set forth in the map below.



70.     Jerome was built as a company town in approximately 1920.  Upon information and belief, the former C.J. Jones Lumber Company ("**C.J. Lumberyard**") operated its mill there and employed the residents.  C.J. Jones leased the land from an entity called Manhattan Mercantile Corporation ("**Manhattan Mercantile**"), which was owned by members of the Collier family. The land was later deeded by Manhattan Mercantile to Collier Development. The C.J. Lumberyard produced record quantities of railroad ties and telephone poles, the tools of growth in the 1900s. Indeed, the C.J. Lumberyard became the biggest manufacturer of treated wood products in the Southeast United States.

71.     In 1956, the C.J. Jones Lumberyard, ground zero for the creosote explosion, ceased operations.  Within just a few days,  a large fire broke out at the

mill and storage tanks containing at least 3000 gallons of chemical creosote—a cancer-causing wood preservative—exploded.

72.    Creosote, which is derived from coal tar, is a carcinogen and poses many health risks that include cancer, infertility, birth defects, and various respiratory, skin and neurological problems such as asthma, bronchitis, irritability, light-headedness, and extreme fatigue.

73.    Upon information and belief, when C.J. Jones closed the mill, many residents left the town.

74.    However, for those who remained or moved more recently to the area, water quality issues became apparent.  Jerome residents had long reported a foul chemical odor and lingering, unpleasant taste in their water.

75.    In 1989, after visiting a family member in Jerome, a concerned citizen alerted Florida's Pollution Control Department that her family member's water had a sheen, smelled of diesel, and caused a burning sensation when showering. Investigators from the Florida Department of Environmental Regulation ("**FDER**") were dispatched to collect a series of groundwater samples that ultimately revealed high levels of dioxins and other poisons associated with creosote.  According to government investigators, it was "evident that a coal tar creosote wood preservative was released to the ground and/or ground water" in amounts that violated the minimum criteria for ground water established by Florida Administrative Code Rule 17-3.404.  Consent Decree ¶ 5.  FDER officials identified the Jerome case as a "major enforcement action" requiring "significant

environmental corrective measures." *See* October 29, 1990 Memorandum from Deputy Assistant Secretary of South Florida District to Office of Public Information re: News Release: Collier Development Corporation at 1.

76.    *The Naples Daily News* later conducted its own investigation. Published in summer 2004, its exposé—"Creosote: Tainted Water"—found that that Collier Enterprises submitted "incomplete and outdated evidence . . . to guide the cleanup process . . . [to] save[] the company millions of dollars" and "craft a cleanup agreement with the state in more favorable terms."  Alan S. Zagier, "Creosote: Tainted Water," *The Naples Daily News*, at 8-11 (May 23, 2004). According to the Daily News's investigative reporting, Collier Enterprises strategized with outside consultants to minimize the nature and extent of creosote use at the mill in order to convince state officials to mis-categorize the problem as a "solid waste site," instead of a "hazardous waste" cleanup site,  commonly known as Superfund sites.  *Id.*

77.    Classification of the Everglades Parcel as a Superfund site, which is reserved for the most contaminated sites, would have required additional protocols to be followed in conducting the remediation that would have been more expensive, but also more thorough.  Upon information and belief, other sites contaminated by creosote are classified as Superfund sites.  For example, the former site of the American Creosote Works wood treatment facility in Pensacola, Florida, is a Superfund site due to the significantly elevated presence of contaminants in the soil and groundwater  caused by creosote.

78. On October 11, 1990, Collier Development executed the Consent Decree with FDER to remediate the property.

79. The Consent Decree required Collier Development to complete a contamination assessment report, conduct site remediation, and pay a $36,000 settlement, apparently compensating FDER for some of its investigative work. *See* Consent Decree ¶ 15. The Consent Decree also ordered Collier Development to "ensure that bottled water will continue to be provided to those residents of Jerome, Florida whose water supplies had been rendered unsuitable" and to "provide within a reasonable time at its expense a potable alternative water supply." *Id.* ¶¶ 13-15. Yet more than ten years later, Jerome residents were still relying on Collier water deliveries with no provision of an alternative potable source of water.

80. In 2003, a group of current and former Jerome residents sued Collier Development and Collier Enterprises, bringing dozens of wrongful death and personal injury claims arising from the Jerome creosote spill. Some of the residents alleged that they had developed health problems, including cancers, respiratory infections, infertility, behavioral issues, and skin conditions such as lesions and rashes. The residents also alleged Collier Enterprises was negligent for failing to notify them of the potential contamination risks associated with their properties arising from the 1956 fire and its aftermath.

81.    The lawsuits brought by the residents of Jerome against Collier Development and Collier Enterprises settled in 2005, according to *The Naples Daily News*.

### Brown's Assignment Regarding the Everglades Parcel

82.    Highly motivated to sell the Everglades Parcel, Mrs. Collier had secured a spot for a representative of Collier Enterprises to attend an exclusive meeting with President Trump and his aides with the goal of eliciting federal interest in the parcel.   Mrs. Collier encouraged Brown to represent Collier Enterprises at the meeting.   Upon information and belief, Mrs. Collier had recommended Brown for this role because Brown was well-versed in Washington politics, but not familiar with the toxic history of the parcel.

83.    On June 18, 2019, Collier Enterprises' then-CEO, Don Huffner, called Brown to brief her on her assignment.  Huffner mentioned to Brown that the parcel had been languishing, and that the Company had planned to wait another seven years before doing away with it.   Nevertheless, he explained that Collier Enterprises wanted Brown to promote the property to the President for a potential acquisition.  As Brown eventually became aware, Collier Enterprises wanted to dispose of the contaminated property expeditiously so as to make the ultimate sale of the Company's assets more attractive to Tarpon Blue, the potential private buyer.

84.    That same day, Huffner provided Brown with specific talking points for the upcoming meeting with President Trump and campaign and White House

officials. Brown was to market the property as an opportunity for the government to expand Everglades National Park.

85.    In the days leading up to this high-level meeting, neither Mrs. Collier nor any member of the Collier family or agent of Collier Enterprises mentioned to Brown the sordid history of the parcel or the contamination, that remained on the property.  To the contrary, Brown was provided with talking points that directed her to market the property as an opportunity for the government to expand the Everglades National Park and secure an environmental win.

86.    On June 19, 2019, armed with the talking points, Brown met with and skillfully introduced the Everglades Parcel as instructed to key senior campaign aides and White House staff, having no knowledge of the toxic pollution on the property.   The meetings that day were a success, engendering immediate federal interest in acquiring the parcel.

### *Mrs. Collier Misrepresents the Condition of the Everglades Parcel*

87.    On or about July 1, 2019, Mrs. Collier directed Brown to attend a Collier Executive Team Retreat at the Collier Ranch in White Silver Springs, Montana to debrief Collier Enterprises leadership team and the Collier family on her successful meeting with President Trump and his senior White House team. Mrs. Collier was also present.  When Brown reported on the meeting and its success, neither Mrs. Collier nor the Company executives, elected to advise or warn

Brown regarding the history of the Everglades Parcel and its creosote contamination issues.

88.    After the debrief, Brown walked through the Collier Clubhouse with Mrs. Collier and asked her about the history of the Everglades Parcel.

89.    Mrs. Collier orally explained to Brown that the parcel was long-held family land purchased by Barron Gift Collier I, surrounding Everglades City, and expanded north from there.  For the first time, Parker Collier revealed to Brown that there was once contamination in that parcel, which Mrs. Collier claimed was not the Colliers' fault, and complained that the Colliers had to pay to clean it up. Mrs. Collier directed Brown not to discuss the creosote history as the explosion had happened long ago and was dealt with.

90.    Mrs. Collier knew or should have known that her statement regarding the condition of the property was not true given her extensive and longtime involvement in Collier business affairs and her role as an adviser to Miles Collier. Her husband, Miles Collier, Managing Partner of Collier Enterprises, was a signatory to the Consent Decree and the head of Collier Development, the entity that was the subject of the lawsuit brought by Jerome residents in 2003 as a result of its failure to adequately remediate the property.

91.    Mrs. Collier not only deliberately requested that Brown lead talks with the White House regarding the Everglades Parcel opportunity while failing to disclose its toxic history, she knowingly misrepresented that the contamination had been cleaned up and omitted crucial facts as to the polluted condition of the

property so as to induce Brown to continue to be associated with and promote the sale of the property. Driven by her goal to offload the contaminated property—a deal that would directly benefit her—Mrs. Collier lied to Brown. Her intent was to discourage Brown from asking more questions and potentially derailing the land acquisition by unearthing the extent of the contamination of the Everglades Parcel and the Collier Family's efforts to cover it up.

92.    Brown's reliance on Mrs. Collier's representation was reasonable and justifiable. Brown, who was not a resident of Florida, did not know, nor could she have known without an in-depth investigation, the detailed history and extent of the creosote contamination or the Colliers' failed remediation of the property or that the Everglades Parcel was in fact still contaminated by creosote. Furthermore, having had a decade-long personal relationship with Mrs. Collier, who had a long-standing knowledge of the Everglades Parcel, Brown had no reason to doubt Mrs. Collier's representation that the creosote contamination had been cleaned up.

93.    Brown relied on Mrs. Collier's misrepresentation about the condition of the Everglades Parcel to her detriment as she continued communications with both White House staff and Florida state officials regarding acquisition of the property, unwittingly marketing the land as an valuable environmental opportunity to expand the Everglades National Park without knowing about or communicating its dangerous creosote contamination.

### *Brown Attempts to Uncover the Parcel's True History and is Terminated*

94.    After Brown's brief conversation with Mrs. Collier about the history of the Everglades Parcel, Brown subsequently asked Huffner if there was something she needed to know about creosote related to the property.  Rather than providing any details, Huffner dismissively told Brown: "Don't bring it up."

95.    Meanwhile, state government interest in acquiring the property was rapidly growing.  On January 24, 2020, Brown attended a private lunch with Governor DeSantis, his senior political aide Heather Barker, and lobbyist and chief fundraiser Nick Iarossi.  The lunch took place at the Old Collier Golf Club in Naples, Florida.  Executives from Collier Enterprises were also present.  Brown engineered this lunch to promote the sale of the Everglades Parcel and allow the Colliers and Governor DeSantis to meet and cement their understanding of the acquisition.  By February 2020, the pace of work related to the potential federal acquisition had also been increasing, and another important meeting with President Trump's team was on the horizon. In light of the governmental interest in the land, on February 14, 2020, at lunch with Miles Collier and Barron Collier II, Brown asked about the creosote again. Miles Collier, who appeared surprised that Brown referenced the creosote, said nothing.  Barron Collier II strongly and quickly responded to Brown's inquiry, clearly directing her not to raise it.

96.    The very next day, on February 15, 2020, Brown attended a private event in West Palm Beach, Florida where she met with President Trump's senior

campaign officials and White House aides and discussed the progress related to the acquisition of the Everglades Parcel. Relying on the misrepresentations of Mrs. Collier and the leadership of Collier Enterprises, Brown continued to promote the land and keep the deal moving forward, unaware of the deadly pollution that remained on it.

97.    After Brown's uncomfortable questions about the history of the Everglades Parcel, as well as her reporting of Heffner's misconduct related to Rivergrass, Mrs. Collier abruptly engineered her termination on April 27, 2020 as described in the previous allegations. Just two days later, on April 29, 2020, the Florida Department of Environmental Protection sent a letter to Collier Enterprises to memorialize their intent to begin purchasing  portions of the property. The letter stated that the necessary appraisal for the Everglades Parcel had been completed and that the State of Florida was prepared to negotiate a cash sale for the first $2 million of the property.

98.    On April 28, 2023, the State of Florida entered into an agreement with several Collier business entities to purchase the Everglades Parcel for nearly $30 million. Tellingly, there is no mention of creosote in the Sale Agreement.

99.    In light of this material omission, and upon information and belief, consistent with their pattern of misrepresentation regarding the property, the Colliers failed to disclose the presence of creosote on the Everglades Parcel to state authorities.

### *The Current Condition of the Everglades Parcel*

100.   As Brown pieced together the reason for her abrupt termination, she began to investigate and unearth the true condition of the Everglades Parcel.

101.   Recent testing of land immediately adjacent to the Everglades Parcel indicates that creosote-related contaminants remain on the land and in the drinking water to this day.  Drinking water samples from May and June 2024 were tested for the presence of compounds found in creosote, including polycyclic aromatic hydrocarbons ("**PAHs**").  These are a class of organic compounds that are regulated for causing health risks, including an elevated risk of cancer.  *See* Avani Bharatkumar Patel et al., *Polycyclic Aromatic Hydrocarbons: Sources, Toxicity, and Remediation Approaches*, Frontiers in Microbiology (2020).  The water samples were tested and the resulting PAH analytes were measured in micrograms per liter ("µg/L") (equivalent to parts per billion).  This testing revealed as many as eight PAHs regulated by the EPA. In May 2024, the testing detected the presence of PAHs including acenaphthene, dibenzofuran, fluoranthene, fluorene, phenanthrene, pyrene, benz(a)anthracene, and chrysene. The accumulated concentration of these PAHs was 2.009 µg/L. In June 2024, after a heavy rainfall, which should have significantly diluted the presence of contaminants with fresh water, the testing detected acenaphthene, fluoranthene, fluorene, phenanthrene, pyrene, benz(a)anthracene, and chrysene.   The accumulated concentration of these PAHs was 1.615 µg/L.  The drinking water immediately adjacent to the Everglades Parcel therefore continues to show to this day contamination resulting from creosote pollution.

102.    According to Dr. James Dahlgren, an expert who has studied toxic chemical exposure since 1973 and who reviewed the testing results, the "finding of PAHs in the drinking water means that water from that well will produce adverse health effects for those using that water" and the results are "the tip of the iceberg reflecting likely widespread water contamination" that poses significant health risks.  That same expert explained that the "water and soil around Jerome and Everglades City are contaminated and need to be remediated or it will be a toxic source for hundreds of years."

103.    This testing on two random days in May and June likely understates the extent of the creosote on the Everglades Parcel and surrounding lands, and, upon information and belief, systematic testing would reveal a much more extensive problem given the level of creosote toxicity and its ability to easily spread through soil and water supplies.

104.    Nonetheless, upon information and belief, immediately after the State of Florida purchased the Everglades Parcel, in a flurry of environmentally-friendly publicity, Collier Enterprises immediately stopped providing bottled water to the residents of Jerome.  Thus, as of October 2023 when the Collier family sold its tainted Everglades Parcel to the State of Florida, Collier Enterprises knowingly left the remaining residents with only a polluted water source since, upon information and belief, they never complied with the Consent Decree's requirement to provide residents with an alternative potable water supply.

105.    Upon realizing that, as a result of Mrs. Collier's misrepresentation and omission regarding the condition of the land, Brown unwittingly had aided the Colliers failure to withhold important information from government officials that led them to believe the Everglades Parcel was more valuable than it was, Brown suffered severe emotional harm and has not been able to work since.

****

## FIRST CLAIM FOR RELIEF
### Tortious Interference with a Business Relationship

106.    Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

107.    Plaintiff Sonja Eddings Brown maintained a business relationship with Collier Enterprises, absent a contract, that afforded Brown legal rights.

108.    Defendant Parker Collier knew about the existence of the business relationship between Brown and Collier Enterprises.

109.    Mrs. Collier intentionally and unjustifiably interfered with Brown and Collier Enterprises' business relationship.

110.    Mrs. Collier's interference with Brown and Collier Enterprises' business relationship was done in bad faith and with malice.

111.    As a result of Mrs. Collier's interference, Brown suffered damages—including loss of income, business opportunity, and goodwill, as well as emotional distress and reputational harm.

## SECOND CLAIM FOR RELIEF
## Tortious Interference with a Contract

112.  Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

113.  Plaintiff Sonja Eddings Brown executed a contract with Collier Enterprises Management.

114.  Defendant Parker Collier knew about the existence of the contract between Brown and Collier Enterprises.

115.  Mrs. Collier intentionally and unjustifiably interfered with Brown and Collier Enterprises' contract.

116.  Mrs. Collier's interference with Brown and Collier Enterprises' contract was done in bad faith and with malice.

117.  As a result of Mrs. Collier's interference, Brown suffered damages—including loss of income, business opportunity, and goodwill, as well as emotional distress and reputational harm.

## THIRD CLAIM FOR RELIEF
## Unjust Enrichment

118.  Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

119.  Brown conferred a benefit on Mrs. Collier by undertaking various projects, as directed by Mrs. Collier, to advance Mrs. Collier's personal and business interests.

120.    Mrs. Collier took advantage of her personal relationship with Brown to direct Brown to execute these projects on her behalf without additional compensation.  At all relevant times, the responsibilities and obligations taken on by Brown, as directed by Mrs. Collier, were not within the scope of her employment duties or any other agreement between Brown and Mrs. Collier or between Brown and an entity affiliated with the Collier family.

121.    Mrs. Collier directed and/or encouraged Brown to take on these projects because she knew Brown would advance her interests successfully.

122.    Indeed, Brown executed these projects successfully, conferring benefits on Mrs. Collier.  Brown reasonably expected to be compensated for this additional work but was not.

123.    Mrs. Collier accepted and retained the benefit of Brown's services.

124.    It would be unjust to allow Mrs. Collier to retain the benefit of Brown's services without due compensation to Brown.

## FOURTH CLAIM FOR RELIEF
### Quantum Meruit

125.    Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

126.    Brown conferred a benefit on Mrs. Collier by undertaking various projects, as directed by Mrs. Collier, to advance Mrs. Collier's personal and business interests.

127.    Mrs. Collier took advantage of her personal relationship with Brown to direct Brown to execute these projects on her behalf without additional compensation.  At all relevant times, the responsibilities and obligations taken on by Brown, as directed by Mrs. Collier, were not within the scope of her employment duties or any other agreement between Brown and Mrs. Collier or between Brown and an entity affiliated with the Collier family. Mrs. Collier directed and/or encouraged Brown to take on these projects because Mrs. Collier knew Brown would advance her interests successfully.

128.    Indeed, Brown executed these projects successfully, conferring additional benefit on Mrs. Collier beyond the provision of Brown's services alone.

129.    On past occasions where Mrs. Collier directed Brown to perform services on her behalf, Mrs. Collier arranged for Brown to be compensated. Accordingly, the circumstances made it such that it was reasonable to infer that these projects would be treated no differently, and Brown would be compensated fairly by Mrs. Collier for her services.

130.    Mrs. Collier accepted and retained the benefit of Brown's services.

131.    It would be unjust to allow Mrs. Collier to retain the benefit of Brown's services without due compensation to Brown.

## FIFTH CLAIM FOR RELIEF
## Fraudulent Misrepresentation

132.    Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

133.   Mrs. Collier intentionally made material misrepresentations and omissions to Brown including the past and present creosote contamination on the Everglades Parcel and that the Colliers had suspended, and ultimately, terminated Huffner from their company.

134.   Mrs. Collier knew her representations to Brown were false or made with reckless disregard for the truth.

135.   In making the false representations and omissions, Mrs. Collier intended to induce Brown to continue her efforts to promote the sale of the Everglades Parcel to government officials and obtain approval of the Rivergrass development from government officials.

136.   Brown relied on Mrs. Colliers representations and omissions to her detriment when she continued her efforts to secure a successful outcome for the Everglades and Rivergrass land deals.

137.   Brown did not know, nor could she have known,  that Mrs. Collier's representations regarding the Everglades Parcel and Huffner were untrue.

138.   Brown did not have actual or constructive knowledge of the Everglades fraud until after she hired investigators to take samples of the drinking water near the Everglades Parcel and the May 2024 results (and subsequent June 2024 results) indicated elevated levels of contaminants related to creosote.

139.   Nor did Brown have any basis to doubt Mrs. Collier's representation that the Colliers had terminated their business relationship with Huffner after being advised of his misconduct until Brown subsequently learned that Huffner

36

was still working for the Colliers.  By then, Brown had already communicated this mis-information to government officials and other prominent individuals.

140.    Mrs. Collier's false representations to Brown caused Brown significant damage.

**SIXTH CLAIM FOR RELIEF**
**Fraudulent Inducement**

141.    Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

142.    Mrs. Collier intentionally made material misrepresentations and omissions to Brown including the past and present creosote contamination on the Everglades Parcel and that the Colliers had suspended, and ultimately, terminated Huffner from their company.

143.    Mrs. Collier knew her representations to Brown were false or made with reckless disregard for the truth.

144.    In making the false representations and omissions, Mrs. Collier intended to induce Brown to continue her efforts to promote the sale of the Everglades Parcel to government officials and obtain approval of the Rivergrass development from government officials.

145.    Brown relied on Mrs. Colliers representations and omissions to her detriment when she continued her efforts to secure a successful outcome for the Everglades and Rivergrass land deals.

146.    Brown did not know, nor could she have known,  that Mrs. Collier's representations regarding the Everglades Parcel and Huffner were untrue.

147.    Brown did not have actual or constructive knowledge of the Everglades fraud until after she hired investigators to take samples of the drinking water near the Everglades Parcel and the May 2024 results (and subsequent June 2024 results) indicated elevated levels of contaminants related to creosote.

148.    Nor did Brown have any basis to doubt Mrs. Collier's representation that the Colliers had terminated their business relationship with Huffner after being advised of his misconduct until Brown subsequently learned that Huffner was still working for the Colliers.  By then, Brown had already communicated this mis-information to government officials and other prominent individuals.

149.    Mrs. Collier's false representations to Brown caused Brown significant damage.

**SEVENTH CLAIM FOR RELIEF**
**Fraudulent Concealment**

150.    Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

151.    Mrs. Collier intentionally concealed or failed to disclose a material fact regarding the past and present creosote contamination on the Everglades Parcel and the Colliers' suspension and termination of Huffner from the Company.

152.    Mrs. Collier knew or should have known these material facts should be disclosed.

153.    Mrs. Collier knew the concealment of or failure to disclose these material facts would induce Brown to continue her efforts to promote the sale of

the Everglades Parcel and obtain approval of the Rivergrass development from government officials.

154.    Mrs. Collier had a duty to disclose these material facts to Brown.

155.    Brown relied on Mrs. Colliers representations and omissions to her detriment when she continued her efforts to secure a successful outcome for the Everglades and Rivergrass land deals.

156.    Brown did not know, nor could she have known,  that Mrs. Collier's representations regarding the Everglades Parcel and Huffner were untrue.

157.    Brown did not have actual or constructive knowledge of the Everglades fraud until after she hired investigators to take samples of the drinking water near the Everglades Parcel and the May 2024 results (and subsequent June 2024 results) indicated elevated levels of contaminants related to creosote.

158.    Nor did Brown have any basis to doubt Mrs. Collier's representation that the Colliers had terminated their business relationship with Huffner after being advised of his misconduct until Brown subsequently learned that Huffner was still working for the Colliers.  By then, Brown had already communicated this mis-information to government officials and other prominent individuals.

159.    Mrs. Collier's false representations to Brown caused Brown significant damage.

## EIGHTH CLAIM FOR RELIEF
### Negligent Misrepresentation

160.   Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

161.   In the course of Brown's business activities on behalf of the Collier family, Mrs. Collier made material misrepresentations and omissions to Brown including the past and present creosote contamination on the Everglades Parcel and that the Colliers had suspended, and ultimately, terminated Huffner from their company.

162.   Mrs. Collier acted negligently because she knew or should have known that her misstatements and omissions  to Brown were false or made with reckless disregard for the truth.

163.   In making the false representations and omissions, Mrs. Collier intended to induce Brown to continue her efforts to promote the sale of the Everglades Parcel and obtain approval of the Rivergrass development to government officials.

164.   Brown justifiably relied on Mrs. Colliers representations and omissions to her detriment when she continued her efforts to secure a successful outcome for the Everglades and Rivergrass land deals.

165.   Brown did not know, nor could she have known,  that Mrs. Collier's representations regarding the Everglades Parcel and Huffner were untrue.

166.   Brown did not have actual or constructive knowledge of the Everglades fraud until after she hired investigators to take samples of the drinking water near the Everglades Parcel and the May 2024 results (and subsequent June 2024 results) indicated elevated levels of contaminants related to creosote.

167.   Nor did Brown have any basis to doubt Mrs. Collier's representation that the Colliers had terminated their business relationship with Huffner after being advised of his misconduct until Brown subsequently learned that Huffner was still working for the Colliers.  By then, Brown had already communicated this mis-information to government officials and other prominent individuals.

168.   Mrs. Collier's false representations to Brown caused Brown significant damage.

## NINTH CLAIM FOR RELIEF
### Constructive Fraud

169.   Brown repeats and realleges paragraphs 1 through 105 as if fully set forth herein.

170.   Mrs. Collier and Brown had a confidential relationship in which Mrs. Collier routinely confided in Brown about a range of personal and professional

issues, and relied on her to carry out her personal and business goals. In turn, Brown trusted and had confidence in the representations of Mrs. Collier.

171. Mrs. Collier undertook to advise and counsel Brown on her role of promoting the Everglades Parcel and securing governmental approval for Rivergrass and Brown depended on her representations about the property.

172. Mrs. Collier abused her relationship with Brown when she misrepresented through her misstatements and omissions the condition of the Everglades Parcel and Huffner's suspension and ultimate termination to Brown.

173. Mrs. Colliers' abuse of her relationship with Brown caused Brown significant damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sonja Eddings Brown prays for judgment and relief against Defendant Parker Collier on each claim for relief in this Complaint, as follows:

   a. An award of compensatory damages as allowed by law and, as applicable, to be proven at trial;

   b. Punitive damages;

   c. Costs of this action and pre- and post-judgment interest, to the maximum extent provided by law;

   d. Attorneys' fees and costs; *and*

   e. Any other relief that this Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a trial by jury of any issues so triable.

Dated: June 25, 2024                 _/s/ Olga M. Vieira_

**QUINN    EMANUEL    URQUHART    &    SULLIVAN LLP**

Olga M. Vieira (Fla. Bar No. 29783)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
Facsimile: (305) 901-2975
olgavieira@quinnemanuel.com

Crystal Nix-Hines (*pro hac vice*)
Viola Trebicka (*pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
crystalnixhines@quinnemanuel.com
violatrebicka@quinnemanuel.com

Brendan Carroll (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
brendancarroll@quinnemanuel.com